Good morning. Welcome to the Ninth Circuit. We are here for oral argument in the case of Blythe v. NCAA. And before we start, on behalf of myself and my colleague, Judge Sanchez, we would like to welcome Judge Ezra, who is a judge of the United States District Court for the District of Hawaii. We thank Judge Ezra for serving and hearing cases in the Ninth Circuit. And as I have said before, it would be very difficult for us on the Ninth Circuit to do our job in as timely a way as we would prefer without the volunteers like Judge Ezra. So, Judge Ezra, welcome and thank you very much. Thank you, Judge Bennett and Judge Sanchez, for the wonderful opportunity to sit with you. It's always an honor and a privilege to be able to sit with the wonderful Knights of Dakota Latinos. All right. So, counsel are present. Can both counsel hear me? Yes, Your Honor. Yes, Your Honor. All right. Counsel, have 15 minutes aside and take your time getting ready. But whenever you're ready as the appellant, please feel free to proceed. Thank you, Your Honor. Rakesh Killaru on behalf of the NCAA. And if I could, I'd like to try to reserve three minutes for rebuttal. An antitrust case requires antitrust proof. And that's particularly true when the plaintiff is seeking a mandatory injunction that seeks to change the status quo. Under this court's precedent in Stanley, a plaintiff seeking a mandatory injunction needs to show that the facts and the law clearly favor his position. In this case, the district court erred in granting a mandatory injunction because neither the facts nor the law supported plaintiff's effort to obtain a sixth year of eligibility to play college sports. First, as a legal matter, the district court erred because the NCAA rules at issue here are noncommercial and outside the scope of the Sherman Act under this court's decision in O'Bannon. Second, the district court erred as both a matter of law and fact because there was literally no evidence in the record supporting the key antitrust elements of market definition and anti-competitive effects in a properly pleaded relevant market. If I could start on the question of whether the rules are commercial or not. O'Bannon squarely distinguished rules that, quote, clearly regulate the terms of a commercial transaction, end quote, from, quote, true eligibility rules akin to rules limiting the number of years that student athletes can compete in college sports. Well, I mean, I'm not sure how much ultimately the bottom line here turns on your argument here, but it seems to me that at least to a certain extent, you're over reading what's in O'Bannon where the court talked about a bylaw in another case that, if I'm remembering correctly, later was overruled by the court that issued it. The other case, the Smith case, but it talked about this has a true eligibility rule akin to the rules limiting the number of years that student athletes may play collegiate sports. So I'm not sure exactly what this is, but it doesn't appear to me to jump to leap from the pages of the decision as a holding of the court. Your Honor, I think it is best understood as a holding because the argument in that case was that the NCAA's compensation rules were also eligibility rules. That was the argument that was previously made in that case. And in rejecting that argument, the court said there are some rules that don't fall in that bucket of eligibility rules. That's what we have here. And there's some rules that do. And that's the type of eligibility rule they were talking about. Even if I were to agree with you, and again, hypothetically, when the Supreme Court talked about in Alston things where you have to give a quick look to things that you're on both sides of the spectrum, things that you really can't give a quick look to. I mean, didn't what the Supreme Court really say is you need to look at the rule at issue in the specific context of the economics in play at the moment with a hard, detailed look. And so even if O'Bannon were sort of a pining on something back then, many years ago, I mean, hasn't Alston told us we really didn't need to look at what's going on in the moment. And isn't that actually a large part of the rest of your argument? It is very much so, Your Honor. And I'm happy to turn to that in a minute. But I think just to finish the thought on the noncommercial point, I don't think Alston overturns that holding or walks away from that holding. Alston was quite plainly a case about commercial rules. It was rules limiting the amount of educational compensation student-athletes could receive. In the context of that very case, Judge Justice Kavanaugh issued a concurrence that said everyone agrees the NCAA can require student-athletes to be student-athletes in good standing. So I think even there is a recognition of this distinction. And I would note that at the end of Alston, excuse me, at pages 102 to 03, there's an extended discussion about the fact that judges in antitrust cases shouldn't try to become central planners, shouldn't engage in the type of judicial micromanagement of business decisions. And I think what we've seen over the last year and a half with dozens of these eligibility cases coming into the courts is exactly that type of request for judicial micromanagement. I would almost say the opposite, counsel, because post-Alston with transfer portals, with new NIL deals, and now the new revenue sharing, there's quite a bit more compensation at play within collegiate athletics. I mean, the other thing that O'Bannon mentions is not to elevate form over substance, and as Judge Bennett says, to look specifically at the ruling in question. And here you have a five-year rule that could potentially limit someone's ability to access these greater forms of compensation. What more commercial do you need than that at this point? Your Honor, I don't think the question is whether the rule affects commercial activity. I think the rule is whether the rule directly restrains commercial activity. Does it restrain the amount of compensation versus the period of eligibility? But what I would say is moving to, I guess, our second argument, even if any of that is true, it only underscores how little evidence there was to support the district court's ruling. If it is indeed the case that Alston and the House settlement changed things from O'Bannon, then there needs to be an examination of the market at issue based on evidence in the real world and in real time. That's also clear and straight out of Alston. What the court said at page 93 is whether an antitrust violation exists necessarily depends on a careful analysis of market realities. And every circuit to address this issue on the merits has echoed that exact observation in reversing injunctions exactly like the one at issue here. That was the case in Forkurin at page 870. It was the case in the Elad decision at page 411 where the court said when markets change, so must the antitrust analysis. And it was the case very recently in Robinson from the Fourth Circuit at page 32 of their ruling. But then the question is what evidence was there in the record in this case? And I think it's quite clear if you look at the district court's opinion, starting on the issue of the relevant market, that what the district court did is rely on past judicial precedents. The Martinson decision, which we had an argument on a couple months ago, a couple weeks ago, and Alston. But again, every circuit that's addressed this question has concluded that it is inappropriate to rely on case law from another case in order to say that a market has been established in a different case claiming an antitrust violation. Although, I mean, I guess in terms of the generality of what you're saying, as opposed to the specifics here, if those prior cases, for example, had involved, say, the same school and the same sport, I mean, that would be different than the two prior cases involving, for example, a different sport. Yes, Your Honor. I think it would be true if at most in two circumstances that are present here. First, I think in minimum you would have to have the same sport because I think there's no question that for baseball there are different market opportunities for participants than there are, for example, in football. In baseball, for example, you can go pro right out of high school. You can also go to college. Some of the best players in the history of baseball never, even recently, never went to college. And then on top of that, Your Honor, I think what you would need is decisions that actually themselves were based on an appropriate economic analysis of the market. So I don't mean to re-argue other cases, but I think as Your Honors know, our position is that in Martinson and Bram, there wasn't any economic evidence either. So you can't bootstrap the lack of economic evidence in those cases to make up for a lack of economic evidence here. Let me ask you this. I agree that the record is a little scant on data here, but plaintiffs are relying on the Open Doors report, which has some kind of general statistics about the NIL market and its growth potential in collegiate athletics. Why do you think that falls short on the relevant market definition or anti-competitive harms? I think both of those, Your Honor. I don't think it shows a market definition because it doesn't address the topic of substitution. I think all you had in the district court opinion really cited three things. It cited Martinson, which I've addressed. It cited the plaintiff's own personal experience, which can't be enough to establish a market in an antitrust case. And then it cited this statistic from Open Doors that 71% of MLB draft picks in 2025 came from NCAD1 schools. That doesn't really tell you anything about the set of options available to a student athlete or a potential baseball player who's deciding what their options were. I mean, just very simply, if 71% come from Division 1, 29% are coming from somewhere else. So that right there is evidence that some people are choosing to go pro with different backgrounds besides Division 1. So Division 1 isn't necessarily some kind of unique gateway opportunity that isn't present anywhere else. One of the slides in this report, I think at ER 722, actually compares the top 25 NIL earners against median Major League Baseball salaries. So I don't know. Is there a possibility that it is setting up a contrast to a potential competitor on that slide? Your Honor, I don't think that's the type of evidence that in any way could clearly establish a market to the type decided necessary to justify a mandatory preliminary injunction. I mean, there again needs to be a clear showing of fact and a clear showing of law, clear entitlement that I suppose is a matter of fact or law. A statistic pulled from a slide that's in the record can't tell you what type of evidence there is of substitution. I think if you look at almost any other antitrust case, you have expert evidence or you have an attempt to show that the hypothetical monopolist test is satisfied or a small but significant non-transitory increase in price. There's all kinds of tools one can use to define a market. And simply putting some evidence in the record of some plaintiffs or some players and what amount of compensation they're able to get doesn't establish that. I mean, as a theoretical matter, there could be an expert in multiple fields like baseball, for example, or an economist who could rely on this report as part of an expert opinion subject, of course, to a possible Daubert challenge. But as far as I can tell, we have nothing like that in the record. That's correct, Your Honor. All you have is this report that was attached to the complaint. I also would note that we think the market definition issue cuts in our favor, but so does the issue of anti-competitive effects. Again, to show anti-competitive effects, there needs to be some type of evidence that prices or output are being suppressed. Here, the only thing that the district court cited in a section on anti-competitive effect is a judicial precedent. It cited the Martinson decision, which I've discussed already. It cited the Pavia decision, which has since been vacated by the Sixth Circuit. And it cited the Robinson decision, which was vacated by the Fourth Circuit a few days ago on the precise ground that there was no evidence of anti-competitive effects in the record. So this is that type of no evidence bootstrapping point I mentioned. Can I ask this? The district court seems to rely on the notion of the mere restriction on an entry into a labor market is enough to be anti-competitive. Could that – and I think there would need to be a little more meat on the bone for that to be explained. But could that be likened to a non-compete agreement, for example, among competitors to say we're going to agree not to compete for certain employees? Is there something to that angle? I don't think so, Your Honor. I think first the issue isn't presented here because there wasn't a group boycott claim presented, which is I think the type of claim that would go to what you're referring to here. But second, what Alston says is look at these rules under the rule of reason. I think under the rule of reason, the typical thing you look for is a price effect or an output effect. There's no data or evidence of a price effect at all here. I actually think it's almost impossible to show a price effect because under the House settlement, there's actually an effective revenue sharing cap on sports. So the amount of compensation in the marketplace is now fixed. Separately on output, it's the same number of students who are going to compete every year. It's just a question of who are the students who get to be in that mix or not. So there's not an output restriction either. So I think if you look at the evidentiary record that's present here, it doesn't come close to satisfying the standard in prior cases. And so for that reason, we think this court should follow the approach of every other circuit on this issue and reverse the decision below. Could I just do a quick question just as a matter of practice? I don't think this case has moved, but he's currently on the team, right? That is correct, Your Honor. So if we were to issue a ruling that favored your position, the district court would then, either we would or revamp it to the district court, the injunction would be dissolved. And what would happen to him? I think, Your Honor, he'd have to stop competing in this season. He would still be allowed to pursue his lawsuit to seek a permanent injunction at a later date for competition in a later season based on potentially more evidence. He also has a damages claim in his complaint, and he can pursue that. But if the rule is that he's not eligible and that there's no basis for the injunction allowing him to play. His college career is effectively over. Well, it depends, Your Honor. I think it would depend respectfully on how he wants his college career to unfold. He could potentially compete in a later season if he pursues his claim and wants to come back for another year later and actually wins on the merits. So whether or not his college career is over obviously would be something he would have to decide. But under the operation of the rules, it should have been over already, and there wasn't an evidentiary basis to second-guess that judgment. Thank you, Your Honor. Thank you, counsel, and we'll give you some time for rebuttal. Thank you very much, Your Honor. It pleases the court. My name is Stephen Clay, and I represent the appellee Noah Blythe. The NCAA comes before this court asking them to do something narrow but significant, to find that Judge Strom abused her discretion. That is a heavy burden, and the NCAA cannot meet it because the district court did not, in fact, abuse its discretion. To the contrary, Judge Strom methodically applied the winner's factors, walked through a full rule of reason analysis, and reached conclusions that are based on factual findings that are not only plausible but also supported by the record. This case is straightforward. Noah Blythe is a graduate student and elite baseball player who lost a season to injury, lost another when his university declared bankruptcy and closed midseason, and had his very first season cut short by the COVID pandemic. Go ahead, just a minute. The Supreme Court instructed in Alston, in one of the passages quoted by your friend, whether an antitrust violation exists necessarily depends on a careful analysis of market realities. What evidence did you submit specifically as to what the relevant market was here? Yes, Your Honor. I find essentially virtually nothing in the record that I can point to that you submitted or that the district court relied on consistent with Alston defining the relevant market the way the district court did. So it's very important for me to hear your perspective on what you submitted and what was in the record defining the relevant market. Yes, Your Honor. I think specifically we would look at Mr. Blythe's declaration that said ER 643 and 642. I have that in front of me. Why don't you tell me what paragraph you're looking at? Yes, Your Honor. I think specifically paragraph 18, Your Honor. Paragraph 18, while playing at the NAIA and Division 2 level, I had no reasonable or realistic opportunity to earn any name, image, and likeness compensation, and in fact, earned no NIL money during that time period, end of paragraph 18. Correct, Your Honor. How does that define the relevant market? Your Honor, because I think what it does is it shows the bundle of sticks that's being offered by Division 1 academic opportunity. And I think that Judge Traum correctly found that there is no one else in this market that offers the same sort of suites of services that the Division 1 market does.  Are you done telling me what evidence you offered as to the relevant market? No, Your Honor. I think in addition, there's paragraph 19, which talked about his success as a NAIA player and Division 2 player with no NIL compensation. Your Honor, we cited, as mentioned, the baseball cube, which is at 632, which demonstrates an overwhelming majority of MLB draft picks come from the Division 1 level. 79 come, 29 don't. 21 don't come. Correct. We cited the open doors report, which is at 719, 717, and 721. And that wasn't part of any expert report? You just attached that to your complaint as a report that's out there? That's correct, Your Honor. I think what we have here, Your Honor, is that the NCAA is trying to push this bright line rule that it must be established by an expert as to what is needed to establish a market definition. And I think that that requirement that the NCAA not so subtly presses and pushes doesn't make sense in this context when we're dealing with the Division 1 athletics program, and specifically baseball, because there is no one else that can operate in that realm. But counsel, it kind of begs the question. I mean, why isn't getting drafted out of high school to a major league, minor league team a relevant substitute to NCAA Division 1? First, Your Honor, there's a requirement that if you don't declare out of high school, you have to do two years. So there is a barrier as part of MLB's draft rules and their antitrust exemption that if you're not drafted directly out of high school, there's a two-year period. So that makes it for a 19-year-old kid not a substitute because there's no possible entry into the MLB at that spot. And then what about Division 2, Division 3, or the professional leagues? What about being drafted out of those other areas? I think to follow up on Judge Bennett's question, it may not be a requirement to have an economist, but it's usually an important factor for courts to be able to evaluate what the relevant market is and what the specific market powers and dynamics are at issue in an antitrust case. And so I sit here wondering, why is it that Division 1 collegiate baseball is the relevant market in the context of, well, who are my relevant substitutes? And how do we think about the five-year rule in the context of what choices young players could have in relation to these potential options? Yeah, Your Honor, I think that using Alston as kind of a guiding block, the court analyzed the NCAA's admission in Alston, what the relevant market was for Alston, which was Division 1 and specifically football. And I'm sorry to interrupt your answer to Judge Sanchez's question, and I want you to finish your answer. But the court in Alston made very clear the parties don't challenge the district court's definition of relevant market, and we're not opining on it. That's what the court said. So, I mean, the idea that it was unchallenged in that and it's not a part of the court opinion just can't really mean anything in terms of precedent. But, again, I'm sorry I interrupted your answer to Judge Sanchez's question. And, Your Honor, if I might respond, though, the court also noted that, quote, the NCAA enjoys near complete dominance of and exercises monopsony power in the relevant market. And I think the NCAA didn't challenge that because they know it to be true. The NCAA has created this organization, this beast, that has left largely unchallenged for 100 years, and there is no other player in this market. So using those principles and some of the statements that were made in Austin, as well as some of the findings in Martinson and Brahman, the court then analyzed it within the context of baseball and noted again that there are no other. Some of these places don't provide educational opportunities, right? There are no college degrees at JUCO schools. There are NAIA school. I mean, Noah's own own evidence and own circumstances demonstrate the academic institution. He was at a for-profit university that shut down and went bankrupt in the middle of his season. The school closed. His baseball season was over. That's never happened at an NCAA D1 institution. There was only one for-profit educational institution, Grand Canyon, and that that institution changed a while ago. So these for-profit educational institutions don't exist. Those are it's, again, an evidence of this this bundle of sticks that you get as a D1 athlete that you don't get anywhere else. Maybe the most important thing is the house settlement. That $21 million is part of the settlement agreement for the NCAA's violations of other antitrust clauses only applies to Division I athletes. So if you're a Division II athlete, an NAIA athlete, you don't get access to that $21 million of revenue. Well, counsel, let me ask you this. How many Division I athletes access NIL compensation? You know, sitting here right now, I don't know if the record outside of what we have in the Open Doors report. I don't know if I could give you a person. I didn't see it in the Open Doors report, which is why I asked. You know, it's wouldn't it be relevant to know even if you're a Division I athlete how many or what percentage typically access NIL money and how much? I think I think it could be relevant. I think the fact that the house settlement exists. I think the fact that NIL exists only meaningfully at a Division I level. And I think the fact that Mr. Blythe himself had NIL opportunities is relevant to the inquiry to establish that that is the only market in which provides you these opportunities. Again, let me ask you this. How how do we know that NIL opportunities do not exist outside of Division I? I mean, I I know it's assorted in the declaration, but what's the evidence to support it beyond Mr. Blythe's individual experience? Yes, I think the NIL, the Open Doors report also discussed essentially the amount of NIL that's funneled into what's called the power for the group of five and then the leftover outside of Division I. And you can see the numbers are pretty staggering. And I can that is on page. ER 717. But these are just the NIL market. It's growing market. This doesn't say anything about people in NIA or Division II not being able to access NIL monies. Well, what it what it does say is the opportunity is not there, Your Honor. I think that the extrapolation here is if there's billions of dollars in NIL money at a Division I level and there's three million dollars at everything that is not Division I. It says the opportunity is not not there. And that's borne out by Mr. Blythe's own circumstances. He was essentially an All-American. He received numerous conference awards. If he had played at the D1 level and received these awards, he would have been handsomely compensated. But because he wasn't at the D1 level, he got no sort of NIL funding. Obviously, no revenue sharing under the house because Division II and NIA are not eligible for house revenue sharing. They can't pay to play like Division I athletes for. So I think the evidence generally is that the opportunity exists at a D1 level that doesn't exist elsewhere. And I think that is. Can we talk about the anti? What's the evidence of anti-competitive effects? Is there any evidence in the record that the five-year rule depresses wages or limits output or some other indicator that we would typically look to to see that there's an anti-competitive effect on the market? Yeah, I think, Your Honor, the evidence is that due to the NCA's rule, Mr. Blythe and other similarly situated athletes are excluded from competing in that labor market. And what's unique here is that these athletes are the older athletes, right? These are athletes with experience and success that would likely show that they would be compensated higher than their peers coming in. And this is also supported by this Open Doors report, which demonstrates that transferring makes more money, right? And the part is that you play at a lower level, you have success, and then a larger school comes in. They offer you more NIL and you go to that larger school. So the evidence is that these older players who have, according to the NCA, run out of eligibility are excluded. And these are more experienced players, typically more experienced players or better players that would demand a higher wage. One of the hurdles that I think you have to overcome is the fact that you have now three other circuit courts that have all pointed out the fact that just because an individual entrant is excluded from a labor market doesn't make it anti-competitive. Just the mere fact that there are rules that restrict entry into a labor market doesn't necessarily make it anti-competitive. And so you look to other indicia like wages or output or something else. In other words, for example, if a basketball team is limited to just 15 players, that is restricting the number of people that could play basketball on a college basketball team, but that doesn't necessarily make it anti-competitive. So what is anti-competitive about the five-year rule in this relevant baseball market? Yeah, again, I think I'd go back to Judge Sanchez. You're pointing to the idea that you are excluding otherwise competent labor that would demand a higher wage due to experience and that as being excluded on the basis of the five-year rule excludes these other qualified individuals from participating in and driving up the general price of the market for certain positions and certain players based upon experience and success. And so do we have evidence that it's affecting the price of people who are in Division I that they could earn whether it goes up or down? Is there any evidence in the record as to what would happen to wages? Yeah, I don't think there is direct evidence. I think part of the problem is, again, the unique nature of this market. Most of this is not public. I think Mr. Kalaru might have put it best that he thinks it's, quote, impossible to prove. And that's what the NCA is looking for here is they're looking to make this non-challengeable by requiring this such a strict heightened standard that I think you come into a spot where they're saying you can't challenge us. We get to control this market as we've done. Well, I don't think they're saying we can't challenge you. I think they're saying the Supreme Court and we now know other circuit courts have said you have to come in with specific evidence of the relevant market and the anti-competitive effects. And as one of the circuit court decisions said, and you can't get there by talking about just your client's exclusion and damages. So it may be hard to prove. It may be expensive to prove. But that doesn't mean you don't have to meet the standards set out very clearly by the Supreme Court. And honestly, counsel, I just don't see it in your presentation here as sufficient to support the district court's determination of the relevant market or the anti-competitive effects. And I don't see it in what you've pointed out to us. Your Honor, I appreciate your position. I think overall, when you look at what the court did and she analyzed the evidence before her, she made a factual determined based upon the evidence that those supported them. And even if you disagree with that, that belief, that doesn't mean you get to overturn it given the deferential standard on preliminary injunction. I see my time is concluded. Thank you. All right. Thank you, counsel. Counsel, we'll give you two minutes for rebuttal. Thank you very much, Your Honor. I think just focusing on the evidentiary issues, even if you look at this open doors report, it respectfully can't come close to establishing a relevant market of college division one baseball labor. The report is about a bunch of sports together. It's about football. It's about basketball. It's about baseball. I don't think there's any part of this report that tries to aggregate out which types of spending in baseball are happening at the power one five level versus other levels, which types are coming from division one, which types are not. It's the precise type of thing that you would need an expert or someone or better data or a declarant with more experience than just the plaintiff to come in and say, here is what is actually happening in the market. Here are what the actual substitutes are for incoming student athletes. Here are the set of options available to an athlete going pro right out of high school, going to NAIA, going to division two, going to division three, going to division one. Here are the economic options available to those folks. And based on that, here are conclusions or a factual basis on which you can make conclusions about substitution. Counsel, you're suggesting that an expert would be necessary to do that. I don't think an expert is necessary, Your Honor. I think an expert is customary in antitrust cases. I think if you're trying to get a mandatory injunction and showing a clear entitlement to relief as a matter of fact in a law, an expert may well be an important component, but it's not essential. But I would say that under whatever the standard is, and this is similar to what the Fourth Circuit ruled, we don't exclude the possibility that on a fuller record, the players will succeed in establishing their claim. Obviously, we think they won't, but on a fuller record, they might. But there is simply nothing in the record here that would justify the injunction that was issued. And if it's required to deeply parse the fine lines of a report with no explanation whatsoever, that just kind of proves that there isn't a clear entitlement to relief as a matter of law or fact. I would, if I could just know one minor prudential point. The baseball season, as we understand it, ends in May. And so we understand that the court is operating with time pressure. But given that a mootness issue has been raised in other cases, we would at least raise the possibility that if the court is inclined to reverse and enter an order, reversing with an opinion to follow so that we don't end up in the same potential mootness issues with the other cases. Thank you very much. Counsel, that's why I asked you about what would happen to him. I was trying to get to that mootness issue. Yes, Your Honor. Of course, I think you know our position from the other cases that the season ends doesn't render the issue moot. But I do think you have a case where the season is ongoing. There's no question of mootness presented. I think the only issue of mootness would be based on the timing of an opinion. So obviously, we're very respectful of the court's time and attention. But we did want to float that possibility because otherwise the issue could potentially evade review yet again. And it is recurring in the district court. All right. We thank counsel. I'm sorry, Judge Ezra, did you have something? No, no, no. I was just thanking him. That's all. I'm sorry. That's all right. We thank counsel for their arguments. The case just argued is submitted. And with that, we are adjourned. Thank you. This court for this session stands adjourned.
judges: BENNETT, SANCHEZ, Ezra